Filed 10/29/24  P. v. Mehlenbacher CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JOSEPH MEHLENBACHER,<br><br>    Defendant and Appellant. | D081197<br><br>(Super. Ct. No. SCD288552) |

APPEAL from a judgment of the Superior Court of San Diego County, Francis M. Devaney, Judge.  Affirmed.

Cynthia Grimm, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A. Swenson and Marvin E. Mizell, Deputy Attorneys General, for Plaintiff and Respondent.

# I.

## INTRODUCTION

Joseph Mehlenbacher shot Kenneth C. in the head for being noisy outside an apartment where a friend allowed Mehlenbacher and Mehlenbacher's girlfriend to stay. A jury found Mehlenbacher guilty of first degree murder (Pen. Code, § 187, subd. (a)) and found true the allegation he personally and intentionally discharged a firearm, causing death (*id.*, § 12022.53, subd. (d)). At sentencing the trial court struck the firearm enhancement and sentenced Mehlenbacher to 25 years to life in prison.

Mehlenbacher contends the trial court prejudicially erred when it (1) excluded evidence of Kenneth's character for violence; (2) admitted items from Mehlenbacher's social media accounts, including two short videos showing law enforcement in pursuit of him and text messages to his grandmother; (3) admitted (a) video showing officers carrying Kenneth down the stairs and performing life-saving measures, (b) a photograph of Kenneth when he was alive, and (c) two autopsy photographs; (4) excluded evidence that someone shot Mehlenbacher six months prior and denied Mehlenbacher's related pinpoint instructions; (5) failed to instruct the jury on the lesser included offense of involuntary manslaughter; and (6) failed to assist the jury during its deliberations with a proper response to a jury note, while also responding to a jury question without notice to, and in the absence of, Mehlenbacher and defense counsel. Mehlenbacher also asserts instances of prosecutorial error related to the prosecutor's opening statement and closing argument. Also, to the extent any issues are forfeited based on his defense counsel's failure to object at trial, Mehlenbacher claims he received ineffective assistance of counsel. Finally, he asserts cumulative error

2

resulted in an unfair trial. We find no prejudicial error and affirm the judgment.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

In December 2020, Mehlenbacher (then 18 years old) and his girlfriend were staying in Bobby P.'s apartment. The apartment was located above a store on a floor with a few apartments. The living floor was small, noisy, with thin walls making hallway disturbances easy to hear. The complex was not secure and homeless people slept in the building. Kenneth loitered inside the building, consumed drugs there, and often cussed, yelled, and screamed.

Around 10:30 p.m. on December 26, Bobby got home. As he stood at the base of the stairwell, he heard Mehlenbacher arguing with someone, telling the other person to shut up and "[s]top making so much noise." Bobby rushed up the stairs. When he got to the top of the stairs, he saw Mehlenbacher telling Kenneth to stop making noise. Mehlenbacher had a gun in his right hand pointing down next to his leg and moving it from side to side. Bobby described Mehlenbacher as very upset. Bobby did not hear Kenneth say anything and described him as staring blankly and pacing from side to side. He claimed Kenneth was not acting aggressively and appeared unarmed.

Bobby told Mehlenbacher to get into the apartment. Bobby then heard Kenneth say, "You're not going to shoot." After Bobby or Mehlenbacher closed the front door, Bobby told Mehlenbacher not to open it and then went to the bedroom to drop off some items he carried, while Mehlenbacher paced around the living room with the gun in his hand. As Bobby walked into the living room from the bedroom, he heard what sounded like a door slamming across the hall. Mehlenbacher "went off" when this occurred.

3

Bobby watched Mehlenbacher open the front door, and heard him say, "I'm going to shoot you." He saw Mehlenbacher pull the slide back on the gun, raise it to shoulder level with his right hand, fire it, and close the door.[1] Mehlenbacher then lowered the gun and slammed the door shut. When Bobby asked Mehlenbacher if he shot Kenneth, Mehlenbacher responded, "Yeah." Bobby told Mehlenbacher to collect his belongings and leave the apartment. In a matter of minutes, Mehlenbacher and his girlfriend left.

Bobby then walked outside his apartment and saw Kenneth lying on the floor with a bloody gunshot wound to his head and a knife next to him that Bobby had not seen earlier. Before police arrived, Mehlenbacher contacted Bobby using an internet messaging application. He apologized for putting Bobby in that situation, asked him to get the "shell" out of the living room and said, "Don't say anything."

When police arrived, they found Kenneth on his back with a bullet wound to his head, a 12-inch knife by his foot, and a skateboard nearby. Officers carried Kenneth downstairs and attempted life-saving measures until the paramedics arrived. An officer could not detect a pulse but saw Kenneth was still breathing.

Less than two hours after Mehlenbacher left the crime scene with his girlfriend, a border patrol agent saw Mehlenbacher's white Honda moving erratically on the highway. The agent activated the lights and siren of his unmarked K9 truck and attempted to pull over the Honda. However, the agent lost sight of the car as it accelerated to over 100 miles per hour. A

---

[1] At the preliminary hearing, Bobby said he was looking at Mehlenbacher when he fired the gun and did not hear Mehlenbacher say anything beforehand. Bobby never told law enforcement he heard Mehlenbacher say he was going to shoot Kenneth, explaining he gave few details because he was trying to give "the bigger picture" regarding what occurred.

second border patrol agent driving a marked car activated his lights and siren and chased Mehlenbacher's Honda.  After a high-speed chase reaching speeds up to 120 miles per hour, the second agent called off the pursuit because the Honda began to endanger other vehicles on the road.  Neither agent knew who was in the car nor received any alerts regarding it.

Police disseminated multiple be on the lookout (BOLO) alerts for Mehlenbacher.  Posts of a BOLO were found on one of Mehlenbacher's social media accounts with a written overlay that said, "Bitch stop playing #free me!"[2]  A graphic was posted from Mehlenbacher's account that said, in vibrant pink writing, "I told y[']all I[']m really a shooter stop playin[']!"  Mehlenbacher's grandmother later reached out to law enforcement and sent screen shots of text messages she received from Mehlenbacher.  The grandmother asked Mehlenbacher to turn himself in and contact the public defender's office.  Mehlenbacher stated, among other things, he would not turn himself in because "It[']s a fuckin['] homicide 187 murder one to the fucking head[,] Gram."

A few days later, based on a tip from a confidential informant, police found Mehlenbacher in an abandoned house and arrested him.  The confidential informant turned Mehlenbacher's cell phone over to law enforcement.

Police searched Bobby's apartment and found a shell casing inside.  The shell casing's location suggested to police that Mehlenbacher was just inside the door frame when he fired his gun.  Ninety-seven percent of the DNA on the shell casing belonged to Mehlenbacher.  Seventy-six percent of the DNA

---

[2]    The record is inconsistent regarding the capitalization and punctuation used in the text messages and social media posts referenced in this opinion. For ease of reading, we use standard capitalization, punctuation, and fonts.

on the knife handle belonged to Kenneth.  An autopsy revealed Kenneth died from a perforating gunshot wound to the head.  The lack of an abrasion mark, stippling, or soot around the entrance wound meant the gun was at least several feet away when fired.

III.

DISCUSSION

A.   *Alleged Evidentiary Errors*

Mehlenbacher contends the trial court erred by excluding evidence of Kenneth's prior behavior.  He also claims the court erred admitting evidence of statements or videos he made in his social media accounts, namely, (1) text messages exchanged between his grandmother and him, (2) BOLO alerts, (3) videos of him in flight from law enforcement, and (4) a video of him holding a gun.

After discussing general legal principles applicable to Mehlenbacher's evidentiary error claims, we analyze each one, starting first with its factual context.

1.   *General Legal Principles*

Relevant evidence is evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."  (Evid. Code, § 210.)[3]  The relevance standard is "very broad." (*People v. Scheid* (1997) 16 Cal.4th 1, 16.)  " 'A trial court has "considerable discretion" in determining the relevance of evidence.' "  (*People v. Jones* (2017) 3 Cal.5th 583, 609.)  "The court, however, has no discretion to admit irrelevant evidence."  (*People v. Babbitt* (1988) 45 Cal.3d 660, 681.)

Even if evidence is relevant, section 352 provides a "court in its discretion may exclude evidence if its probative value is substantially

---

3    Undesignated statutory references are to the Evidence Code.

6

outweighed by the probability that its admission will . . . (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." "The term 'prejudice,' within the meaning of . . . section 352, is not simply damage to the defense that naturally flows from relevant and highly probative evidence, but is instead an emotional reaction that inflames the jurors' emotions, motivating them to have a bias against, or to prejudge, an individual based on evidence that has only slight probative value on the issues. [Citations.] Under that statute, evidence is substantially more prejudicial than probative if it poses an intolerable risk to the fairness of the proceedings or the reliability of the outcome and renders the defendant's trial fundamentally unfair." (*People v. Chavez* (2018) 22 Cal.App.5th 663, 702.)

The abuse of discretion standard typically applies to review of a ruling on the admissibility of evidence. (*People v. Alvarez* (1996) 14 Cal.4th 155, 201.) We will not reverse a court's ruling on such matters unless it is shown " 'the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Brown* (2003) 31 Cal.4th 518, 534.) " 'A "miscarriage of justice" should be declared only when the court, "after an examination of the entire cause, including the evidence," is of the "opinion" that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' " (*People v. Richardson* (2008) 43 Cal.4th 959, 1001, quoting *People v. Watson* (1956) 46 Cal.2d 818, 836.)

Additionally, a reviewing court cannot grant relief on a claim that evidence was erroneously admitted unless a timely objection was made "and so stated as to make clear the specific ground of the objection or motion." (§ 353, subd. (a).) "What is important is that the objection fairly inform the

trial court, as well as the party offering the evidence, of the specific reason or reasons the objecting party believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the court can make a fully informed ruling." (*People v. Partida* (2005) 37 Cal.4th 428, 435.)

To the extent defense counsel forfeited any claims raised in this appeal by failing to properly object at trial, Mehlenbacher can argue he received ineffective assistance of counsel. To prevail on a claim of ineffective assistance of counsel, he must show (1) deficient performance by his counsel and (2) resulting prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687; *People v. Centeno* (2014) 60 Cal.4th 659, 674 (*Centeno*).) While we presume counsel's performance fell within a wide range of professional competence and sound trial strategy, counsel is deficient if there is no conceivable tactical purpose for the failure to object. (*Centeno*, at pp. 674–675.)

Because the decision whether to object to a prosecutor's comments during closing argument is highly tactical, " 'a mere failure to object to evidence or argument seldom establishes counsel's incompetence.' " (*Centeno, supra*, 60 Cal.4th at p. 675.) "On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

8

2.   *No error excluding evidence of Kenneth's prior behavior.*

a.   *Background*

Mehlenbacher moved under section 1103, subdivision (a), to admit Kenneth's character for violence.  The motion proffered evidence of two incidents involving Kenneth: one in February 2019 and the other in June 2020.

In February 2019, Ronald W. claimed Kenneth made a sexual orientation related slur to him as Kenneth sat in front of a liquor store with his pit bull.  Kenneth jumped up from the ground and started hitting Ronald while Kenneth's dog continually bit Ronald.  Ronald was taken to the hospital for his injuries and police arrested Kenneth for assault with a deadly weapon (the dog).  According to the prosecutor, Kenneth said Ronald placed Kenneth in a headlock, causing the dog to attack.  One witness claimed Ronald prevented Kenneth from standing up; another described mutual combat; and a third said Ronald fought for his life as the dog attacked, and Kenneth continued to beat Ronald.

In June 2020, Jitendra B., a motel manager, confronted Kenneth after Kenneth urinated outside a motel window.  During an ensuing argument, Kenneth punched Jitendra in his left eye, causing Jitendra's glasses to fall to the ground.  When Jitendra went inside and got a baseball bat, Kenneth stomped on Jitendra's glasses.  Police cited Kenneth for simple battery and vandalism under $400.

The prosecutor moved to exclude the proffered evidence, arguing: (1) unless Mehlenbacher testified to the contrary, no evidence existed showing Mehlenbacher believed Kenneth posed a threat to him; and (2) the other incidents would cause an undue consumption of time based on conflicting witnesses and the lack of similarity between those cases and the

9

current case. He further argued that if the court permitted Mehlenbacher to introduce any evidence under section 1103, then the prosecution would introduce evidence showing Mehlenbacher's character for violence under section 1103, subdivision (b). This evidence included videos and audio clips Mehlenbacher posted to social media exhibiting a character for violence and claims by Mehlenbacher's mother that Mehlenbacher has been violent since a young age.

The court excluded Mehlenbacher's proffered evidence under section 352 because the incidents were dissimilar to the facts of the present case, would consume too much time, distract and confuse the jury, and be unfair to the prosecution due to the fact Kenneth was no longer alive to tell his side of what occurred. It also excluded the prosecutor's proffered evidence against Mehlenbacher.

Mehlenbacher did not testify at trial. The court instructed the jury with, among other instructions: first or second degree murder with malice aforethought; first degree murder; provocation: effect on degree of murder; justifiable homicide: self-defense; voluntary manslaughter: heat of passion; and voluntary manslaughter: imperfect self-defense. (CALCRIM Nos. 520, 521, 522, 505, 570, 571.) The prosecutor argued Mehlenbacher was guilty of first degree murder, or, at the very least, second degree murder because Mehlenbacher acted with express or implied malice. Defense counsel admitted Mehlenbacher shot Kenneth, but argued the prosecution had failed to prove the shooting was not justified in self-defense, or the shooting was not second degree murder with implied malice, or voluntary manslaughter under the theories of imperfect self-defense or heat of passion.

b.    *Analysis*

Mehlenbacher contends the trial court prejudicially erred by excluding his proffered evidence of Kenneth's character for violence.  The People argue the court properly excluded it under section 352.  We agree with the People.

Section 1101, subdivision (a), prohibits the admission of evidence of a person's character to prove his conduct on a specified occasion.  Section 1103, subdivision (a), provides an exception to that rule, stating, "In a criminal action, evidence of the character . . . of the victim of the crime for which the defendant is being prosecuted is not made inadmissible by section 1101 if the evidence is:  [¶] (1) Offered by the defendant to prove conduct of the victim in conformity with the character or trait of character."  Under section 1103, subdivision (b), when a court admits evidence of a victim's character for violence, the prosecutor may in turn offer evidence of the defendant's character for violence.

"In other words, if . . . a defendant offers evidence to establish that the victim was a violent person, thereby inviting the jury to infer that the victim acted violently during the events in question, then the prosecution is permitted to introduce evidence demonstrating that . . . the defendant was a violent person, from which the jury might infer it was the defendant who acted violently." (*People v. Fuiava* (2012) 53 Cal.4th 622, 696.)  For the purposes of proving self-defense, whether the defendant was aware of the victim's propensity for violence is immaterial because such evidence " 'nevertheless tends to show that the victim was probably the aggressor.' " (*People v. DelRio* (2020) 54 Cal.App.5th 47, 55.)  The admission of a victim's character evidence pursuant to section 1103 "is subject to the dictates of . . . section 352." (*People v. Wright* (1985) 39 Cal.3d 576, 587.)

11

The trial court reasonably expressed concerns about undue consumption of time and potential juror confusion if it allowed evidence under section 1103.  Defense counsel had Ronald and Jitendra, the two victims, under subpoena.  He also had the officers from the Ronald incident under subpoena and knew the location of two other witnesses to the incident.  The Ronald incident entailed the defense presenting evidence from Ronald, at least two officers, and the witness who claimed Ronald fought for his life.  In turn, the prosecution would likely present the witnesses who claimed Ronald prevented Kenneth from standing up and who described mutual combat.  The court appropriately decided conducting such a trial within a trial would consume too much time while also creating confusion regarding the issues.

Additionally, if the jury heard testimony about Kenneth's aggressive and violent character, the People would then be permitted to present the evidence they proposed regarding Mehlenbacher's aggressive and violent character.  (§ 1103, subd. (b).)  This evidence included videos and audio clips Mehlenbacher posted to social media exhibiting a character for violence days before the shooting, including recordings of him holding numerous handguns, bragging about successfully committing armed robberies, and threatening his social media followers and rivals with gun violence.  Mehlenbacher's mother also told investigators her son was violent from a very young age with her claiming, among other things, he attempted to strangle her, bit her, pushed her down the stairs, threatened her with box cutters, and pulled a knife on her.  This evidence risked a significant and undue consumption of time regarding matters unrelated to the shooting.[4]

---

[4]    We understand that the trial court would not necessarily allow all the evidence we describe.  Our conclusion about undue consumption of time remains, however.

In sum, the trial court did not abuse its discretion by excluding section 1103 evidence. Given this conclusion, we need not address Mehlenbacher's argument the asserted evidentiary error was prejudicial except to reject his contention that barring this evidence from the trial amounted to a constitutional violation. (See, e.g., *People v. Abilez* (2007) 41 Cal.4th 472, 503 ["application of the ordinary rules of evidence under state law does not violate a criminal defendant's federal constitutional right to present a defense"].)

3. *Mehlenbacher forfeited any error admitting the text messages with his grandmother and no ineffective assistance of counsel is shown.*

a. *Background*

Mehlenbacher's grandmother worked with law enforcement to bring her grandson safely into custody and sent screen shots of text messages she had received from him to law enforcement. After the grandmother told Mehlenbacher he should call the public defender's office to negotiate his surrender, Mehlenbacher texted his grandmother, among other things, he would continue to strive for his freedom and that "it[']s a fuckin['] homicide 187 murder one to the fucking head[,] Gram." The court ruled the text exchange between Mehlenbacher and his grandmother was "clearly admissible." At trial, the court disagreed that grandmother's request for Mehlenbacher to turn himself in constituted inadmissible character evidence, it overruled defense counsel's hearsay and lack of foundation objections, and admitted into evidence four pages of text message screenshots grandmother emailed to police from her phone.

The court excluded any evidence from Mehlenbacher's cell phone because the prosecution failed to timely disclose to the defense that a confidential informant notified law enforcement about Mehlenbacher's location after the shooting and gave them Mehlenbacher's cell phone. At

13

closing, the prosecutor argued Mehlenbacher's text messages retrieved from his grandmother's cell phone showed his consciousness of guilt and served as an acknowledgment he committed first degree murder, not a lesser offense.

        b.     *Analysis*

Mehlenbacher asserts the text messages should have been excluded because they were inflammatory under section 352, and his response to his grandmother's request to turn himself in and state of mind after the shooting were irrelevant to any disputed issue. He also claims the text messages should have been excluded to prevent the jury from improperly using them as evidence showing his lack of remorse. Finally, he argues anything from his grandmother's phone should have been part of the discovery sanction that resulted in the court excluding evidence from his phone and instructing the jury about "untimely disclosure of evidence."

The People claim Mehlenbacher forfeited his claims because defense counsel never specifically objected to admission of the text messages on the ground they were irrelevant, inflammatory, could be used to show lack of remorse, or because they should have been included as part of the discovery sanction. Mehlenbacher argues no forfeiture occurred because any further objection would have been futile based on the court's pretrial ruling finding the text messages "clearly admissible."

We disagree with Mehlenbacher's contention that any further objection would have been futile. In its pretrial ruling, the court found the text messages "clearly admissible" in response to the People's argument the messages contained admissions regarding the crime. Defense counsel did not raise the objections he now argues. As a result, the court had no opportunity to rule on those objections, and the claims are forfeited on appeal. (§ 353, subd. (a); *People v. Alexander* (2010) 49 Cal.4th 846, 905.)

14

Mehlenbacher argues an objection on hearsay grounds allows a defendant to argue the evidence is irrelevant on appeal, citing *People v. Arcega* (1982) 32 Cal.3d 504, 526–529; *People v. Johnson* (1980) 26 Cal.3d 557, 579; and *People v. Scalzi* (1981) 126 Cal.App.3d 901, 907. These cases are inapposite. They address whether hearsay evidence may be relevant for a nonhearsay purpose and do not address whether a stated hearsay objection preserves an unstated relevancy objection on appeal.

Mehlenbacher also notes he objected to the text messages as character evidence and claims this objection preserved a section 352 objection on appeal, citing *People v. Carpenter* (1999) 21 Cal.4th 1016, 1052; *People v. Clark* (1992) 3 Cal.4th 41, 123–124; and *People v. Roscoe* (1985) 168 Cal.App.3d 1093, 1100. We disagree. In *Carpenter*, the appellant invoked section 352 at trial and argued the proposed evidence showed he was a " 'bad person.' " (*Carpenter,* at p. 1053.) The appellate court found the objection sufficiently clear to preserve a section 1101 objection. (*Ibid.*) The same situation occurred in *Clark*. (*Clark,* at pp. 123–124.) Moreover, *Roscoe* provides that a party's failure to refer specifically to section 352 as a basis for objection does not preclude a trial court from exercising its discretion sua sponte to exclude proffered evidence on that ground. (*Roscoe*, at p. 1100 & fn. 5.) This case is inapplicable because it does not hold an objection under section 1101 preserves a section 352 objection.

Mehlenbacher also contends he did not forfeit his argument that text messages from his grandmother's phone should have been excluded as part of the discovery sanction. He states forfeiture of this argument is inapplicable because his counsel raised numerous other objections to the text messages.

We reject this position because it is contrary to section 353[5] and Mehlenbacher cited no authority to support this proposition.

Accordingly, since Mehlenbacher forfeited the above-referenced objections, his only cognizable claim on appeal is whether he received ineffective assistance of counsel based on his counsel's failure to object to the text messages on the grounds he now argues. We perceive no deficient performance by Mehlenbacher's counsel. The text messages from Mehlenbacher to his grandmother were statements of a party opponent showing he shot Kenneth in the head. (§ 1220) The communications were also relevant for the nonhearsay purpose of demonstrating consciousness of guilt (i.e., that he had done something wrong). (*People v. Curl* (2009) 46 Cal.4th 339, 362.)

Moreover, while Mehlenbacher is correct that lack of remorse is irrelevant at the guilt phase unless a defendant opens the door to this matter (*People v. Riggs* (2008) 44 Cal.4th 248, 301), the prosecutor never argued the text messages were relevant to this issue. We conclude defense counsel did not perform deficiently by failing to object to the admission of the text messages. Accordingly, there is no reasonable probability, absent any deficient performance, the trial's result would have been more favorable to Mehlenbacher. (*People v. Frye* (1998) 18 Cal.4th 894, 979.)

---

[5] Section 353, subdivision (a) provides in relevant part, that a judgment will not be reversed because of the erroneous admission of evidence unless "[t]here appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion."

16

4.    *No error admitting Mehlenbacher's social media posts regarding the BOLO Alerts.*

a.    *Background*

After the shooting, police disseminated multiple BOLO alerts for Mehlenbacher.  Posts of a BOLO, People's exhibit 21, were found on Mehlenbacher's social media account with an overlay written on it saying, "Bitch stop playing #free me!"[6]  Once comments arrived on that post, a graphic in bright pink writing was posted from Mehlenbacher's social media account that said, "I told y[']all I[']m really a shooter stop playin[']!"  The court ruled Mehlenbacher's "shooter" post admissible as "an admission of sorts" and his "free me" statement on the BOLO admissible as "an odd way of bragging about what he did."

During closing argument, the prosecutor briefly argued Mehlenbacher's "shooter" comment revealed Mehlenbacher's intent to kill Kenneth.  The prosecutor made a passing reference to Mehlenbacher's "free me" statement at the very end of his closing argument suggesting Mehlenbacher wanted jurors to free him, but they should not because he had committed first degree murder.  Defense counsel argued Mehlenbacher posted the "shooter" comment because he is 18 years old, wanted attention, and knew he was wanted for murder.  The attorney also stated the evidence did not demonstrate Mehlenbacher knew about the right to self-defense or the distinction between murder and homicide.

b.    *Analysis*

Mehlenbacher asserts the trial court erred when it admitted the two social media posts.  He claims his "bragging" or asking to be "free" had no relevance to any issue before the jury.  He also contends the

_____

[6]    The People subpoenaed the social media company to obtain Mehlenbacher's posts.

17

after-the-fact postings had no relevance to his state of mind when the shooting occurred and were unduly prejudicial. The People respond that defense counsel did not preserve these issues because he failed to object to this evidence in the trial court. We agree. Defense counsel objected to a portion of the "free me" post where another individual posted "free pimp" and requested the court direct the prosecutor to remove this comment. The court agreed. However, defense counsel never objected to admission of the "free me" statement either before or during trial. Similarly, defense counsel did not object to the "shooter" statement before or during trial. Mehlenbacher responds that his pretrial motion adequately preserved the issues and further objection would have been futile.

To preserve a challenge to the admission of evidence for appeal, a party must follow the guidelines set out in section 353. This section prevents a reversal for the improper admission of evidence unless there is a clear record of a timely objection, or motion to exclude or strike the evidence, specifying the exact basis for the objection or motion. (*People v. Morris* (1991) 53 Cal.3d 152, 187 (*Morris*).) This requirement is crucial because a well-grounded objection to specific evidence helps prevent mistakes. (*Ibid.*) It gives the trial court the opportunity to either exclude the evidence or limit its admission to avoid potential prejudice. (*Id.* at p. 188.) This procedure also allows the party presenting the evidence to provide additional foundation, adjust the offer of proof, or take other actions to reduce the likelihood of reversal. (*Ibid.*)

In his pretrial motion, defense counsel asked the court to exclude any evidence of five specific uncharged acts (social media posts), arguing they were irrelevant and inadmissible under sections 352 and 1101. The "free me" and "shooter" postings *were not* among the five postings at issue in the motion and are not even mentioned elsewhere in that brief. Thus,

18

Mehlenbacher's motion in limine was insufficient to preserve any objection to these messages. (*Morris, supra*, 53 Cal.3d at pp. 189–190.)

We reject Mehlenbacher's alternate contention his counsel rendered ineffective assistance due to counsel's failure to object to admitting these postings. A party claiming ineffective assistance of counsel bears the burden of showing both deficient performance under an objective standard of professional reasonableness and prejudice under a test of reasonable probability of a different outcome. (*People v. Gurule* (2002) 28 Cal.4th 557, 610–611 (*Gurule*).) When an ineffective assistance claim can be resolved solely based on lack of prejudice, it is unnecessary to determine whether counsel's performance was objectively deficient. (*People v. Hester* (2000) 22 Cal.4th 290, 297 (*Hester*).)

Assuming, without deciding, defense counsel rendered ineffective assistance by failing to object to admission of the two postings, the assumed error was not prejudicial even under the stricter standard under *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*). " 'The beyond-a-reasonable-doubt standard of *Chapman* "requir[es] the beneficiary of a [federal] constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." [Citation.] "To say that an error did not contribute to the ensuing verdict is . . . to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." [Citation.] Thus, the focus is on what the jury actually decided and whether the error might have tainted its decision. That is to say, the issue is "whether the . . . verdict actually rendered in this trial was surely unattributable to the error." ' " (*People v. Pearson* (2013) 56 Cal.4th 393, 463.)

Here, the court admitted the "shooter" and "free me" statements as admissions. Under section 1220, evidence of a statement is not made inadmissible by the hearsay rule when offered against the declarant in an action to which the declarant is a party. (*People v. Rodriguez* (2014) 58 Cal.4th 587, 637.) Generally, any relevant "statement" of a party is admissible against that party, irrespective of whether it qualifies as a confession or admission. (*People v. Carpenter* (1999) 21 Cal.4th 1016, 1049.) Here, Mehlenbacher was the declarant, the "shooter" and "free me" statements were offered against him, and he was a party to the action. Accordingly, both statements were admissible regardless of whether the statements met the definition of a confession or admission. Additionally, both statements were relevant as to Mehlenbacher's consciousness of guilt and neither statement unduly prejudiced Mehlenbacher because Mehlenbacher's identity as the shooter was not a contested issue at trial. Under these circumstances, defense counsel did not render ineffective assistance by failing to object to admission of these statements.

5. *No error admitting videos of Mehlenbacher in flight.*

a. *Background*

Two videos existed on Mehlenbacher's social media account of him or another person in his car filming the border patrol vehicle, lights flashing, chasing Mehlenbacher's Honda after the shooting. The prosecutor argued these videos were relevant to show consciousness of guilt. Defense counsel argued the videos were irrelevant because Mehlenbacher was not charged with evading law enforcement and the content of the videos merely echoed the testimony a border patrol agent would give during trial. The court noted it would give the consciousness of guilt instruction, finding this "after-the-fact" evidence admissible as to flight and consciousness of guilt,

20

and counsel could argue to the jury what the videos meant. The prosecutor played for the jury the two short videos from Mehlenbacher's social media accounts. The court received the videos into evidence, with defense counsel then stating "[s]ubject to the previous objections."

>       b.    *Analysis*

Mehlenbacher asserts the trial court erred when it rejected his relevance objections to the videos since they did not address a disputed issue and were cumulative to the border patrol agents' testimony. We reject the People's contention Mehlenbacher forfeited his objections by failing to renew them at trial. When the prosecutor requested the videos be moved into evidence, defense counsel initially stated "[n]o objection" but then added "[s]ubject to the previous objections," which the court acknowledged.

Evidence of flight immediately after committing a crime is relevant to show consciousness of guilt. (*People v. Bradford* (1997) 14 Cal.4th 1005, 1055.) "Evidence showing consciousness of guilt . . . is generally admissible within the trial court's discretion." (*People v. Anderson* (2018) 5 Cal.5th 372, 391.) We review a trial court's admission or exclusion of "consciousness of guilt" evidence for abuse of discretion. (*Ibid.*)

Mehlenbacher did not object to instructing the jury with CALCRIM No. 372 regarding a defendant's flight.[7] Generally, a flight instruction "is proper where the evidence shows that the defendant departed the crime scene under circumstances suggesting that his movement was motivated by a consciousness of guilt." (*People v. Ray* (1996) 13 Cal.4th 313, 345; Pen. Code,

---

[7]    CALCRIM No. 372, as given, provides: "If the defendant fled immediately after the crime was committed, that conduct may show that he was aware of his guilt. If you conclude that the defendant [fled], it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant fled cannot prove guilt by itself."

§ 1127c.)  A defendant's high-speed flight from law enforcement is also admissible to show consciousness of guilt.  (*People v. Mason* (1991) 52 Cal.3d 909, 941.)

Accordingly, we reject Mehlenbacher's argument the videos were irrelevant.  We also disagree with his assertions the videos were cumulative of border patrol agents' testimony.  The first video lasted approximately 10 seconds and had no audio.  The second video also lasted about 10 seconds and included audio of a man's voice.  The jury saw both videos and received a transcript of what was said on the second video.  Although this transcript is not included in the record on appeal, its existence shows the video is not cumulative of the border patrol agents' testimony about the car chase.  The videos consumed a few minutes of testimony and did not create a risk of confusing the jury or obscuring the issues.  The trial court did not abuse its discretion admitting these videos.

6. *The court did not violate Mehlenbacher's constitutional rights by allowing a crime scene video and photographs of Kenneth.*

a. *Background*

In his trial brief, Mehlenbacher moved to exclude any unnecessarily "inflammatory photographs" of Kenneth's body.  The People sought to introduce eight autopsy photographs showing the bullet entrance and exit wounds, the gunshot wound, and Kenneth's upper body.  They also sought to admit a photograph of Kenneth in life and an officer's body-worn camera footage from the scene minutes after the shooting occurred to show Kenneth's body position, the injury sustained to his head, the life-saving measures taken by law enforcement at the scene, and the position of the knife found at Kenneth's feet before other officers moved it.

At the hearing on the motions, defense counsel argued the body camera video should be excluded to the extent it showed Kenneth's body being taken

down the stairs by law enforcement to start CPR on him, arguing this section of the video was irrelevant. The court watched the video and found it to be nonprejudicial and relevant for the jury to see the condition of the crime scene until paramedics took over life-saving measures from law enforcement. It granted the motion to admit the video.

As to the autopsy photographs, the prosecutor argued eight photographs were necessary to show the cause of death as a gunshot wound to the head. Two of the photographs showed the entry and exit wounds with the scalp in place. Defense counsel did not object to these photographs. Defense counsel objected to the last two photographs showing the entry and exit wounds with the scalp removed as "highly disturbing" because no dispute existed regarding how Kenneth died. The court admitted six photographs, and reserved ruling on the two disputed photographs until it could see whether the prosecutor could crop those photographs to omit the "gory" details of the skin peeled back. It later admitted the last two photographs, over defense counsel's continuing objection, noting the prosecutor "cleaned [the photographs] up enough for my sake." At trial, over defense counsel's continued objection, the medical examiner discussed the autopsy photographs, including the two photographs showing the bullet entry and exit wounds in Kenneth's skull with the scalp removed.

Defense counsel submitted to admitting the single proffered photograph of Kenneth in life. At trial, the prosecutor used this photograph during his opening statement to identify Kenneth and describe him to the jury. During trial, the lead detective also identified Kenneth from this photograph which was then admitted into evidence without objection.

The prosecutor also used the disputed body-camera video during opening statement to describe the "last moments" of Kenneth's life, which

included the position of his body when the officers arrived, the point where the officers carried him down the stairs and the beginning of life-saving measures. The officer who wore the body-camera later testified Kenneth had a significant amount of blood coming from his head, and officers carried him down the stairs to start life-saving measures. The court watched the video and stated: "[F]irst I thought it was something prejudicial that might engender sympathy with the jury, but I don't see anything prejudicial about what I just watched."

The prosecutor played a portion of the body-camera video for the jury and the court later admitted the video into evidence. During the video, a different officer noted a knife next to Kenneth. The prosecutor also played the video during closing argument to describe the last minutes of Kenneth's life.

b. *Analysis*

Mehlenbacher contends the court erroneously allowed the prosecutor to use at trial: (1) a photograph of Kenneth while alive; (2) two autopsy photographs showing Kenneth's scalp pulled back; and (3) the officer's body-worn camera video which showed officers carrying Kenneth down the stairs and performing life-saving measures. We address each contention in turn and find no prejudicial error.

i. *Photograph of Kenneth Alive*

Mehlenbacher asserts the photograph of Kenneth when he was alive was irrelevant because the parties did not dispute his identity and the prosecutor then improperly used the photograph for a reason other than that for which it was admitted. We disagree. Mehlenbacher forfeited any issue regarding the picture being admitted into evidence by submitting on its admissibility and allowing the prosecutor to use it at trial without objection.

24

Even so, Mehlenbacher contends defense counsel was constitutionally ineffective for not objecting.

Here, because defense counsel submitted on the admission of the photograph, the prosecutor did not explain its relevance and the court did not state the grounds allowing it into evidence. On this record, Mehlenbacher has not shown how allowing the jury to see the single photograph prejudiced him. Mehlenbacher admitted shooting Kenneth, and the primary issue at trial was whether he committed murder or voluntary manslaughter. While the photograph was not relevant to this disputed issue, it was not "likely to have appreciably intensified whatever feelings—whether of hostility toward [Mehlenbacher] or sympathy toward [Kenneth]—that the jury may have developed in this case." (See *People v. Poggi* (1988) 45 Cal.3d 306, 323.) We conclude any error was harmless beyond a reasonable doubt under *Chapman, supra*, 386 U.S. 18. With no prejudice shown, we need not determine whether defense counsel's performance was deficient. (*Hester, supra*, 22 Cal.4th at p. 297.)

#### ii.    *Autopsy Photographs*

Mehlenbacher contends the court erred by admitting the two autopsy photographs over his objection because they were not necessary to explain the medical examiner's testimony regarding how Kenneth died. Even assuming the photographs had some relevance, he contends this was substantially outweighed by the danger of unfair prejudice.

Appellate courts "have rejected the contention that photographs of a murder victim must be excluded as cumulative simply because testimony also has been introduced to prove the facts that the photographs are intended to establish." (*People v. Crittenden* (1994) 9 Cal.4th 83, 134–135.) Prosecutors "are not obliged to prove their case with evidence solely from live witnesses,"

25

and a jury is "entitled" to see photographs of a victim's body "to determine if the evidence supports the prosecution's theory of the case." (*Gurule, supra*, 28 Cal.4th at p. 624.) We will not disturb the trial court's exercise of its discretion unless the probative value of the two autopsy photographs clearly is outweighed by their prejudicial effect. (*Crittenden*, at p. 134.)

The two photographs in question, exhibits 7 and 8, showed the entry point of the bullet on the side of Kenneth's head and the exit point to the back of his head after the scalp had been removed from the skull. The prosecutor argued these photographs supported the medical examiner's testimony because the photographs with the scalp in place do not look like bullet wounds. The court agreed, stating, "It looks like [the wounds] could have been [made] with a baseball bat or something or the other." The medical examiner briefly referred to exhibits 7 and 8 to discuss the bullet's direction and path and explain why the wounds with the scalp in place looked different from the wounds with the scalp removed.

We examined all the photographs. We agree the photographs of the entry and exit wounds with the scalp in place do not conclusively show the wounds were caused by a bullet. While graphic, the two disputed photographs showing the entry and exit wounds with the scalp removed were relevant to assist the jury in understanding the medical examiner's testimony. Even assuming the court erred by admitting them, they are not so impactful as to undermine the jury's rationality. Accordingly, the trial court acted within its discretion in finding the risk for undue prejudice did not greatly outweigh the probative value presented by each admitted photograph.

### iii.    Body Camera Video

An officer who responded to the murder scene wore a body camera. Mehlenbacher contends the video showing the officers arriving at the scene,

26

finding Kenneth, carrying him down the stairs, and performing CPR should have been excluded as irrelevant and unduly prejudicial. The People contend the video corroborated the officer's testimony about the crime scene, what occurred immediately after officers arrived, and the knife's location.

Victim photographs in murder cases " 'are disturbing' " and while the jury should be shielded from photographs that are "unnecessarily gruesome," "the jury cannot be shielded from an accurate depiction of the charged crimes that does not unnecessarily play upon the emotions of the jurors." (*People v. Ramirez* (2006) 39 Cal.4th 398, 454 (*Ramirez*).) The same can be said about a first responder's body camera video. We viewed the video which is just over three minutes long. A skateboard can be seen by Kenneth's feet at the 34-second mark, and at the 59-second mark one officer states, "there is a knife right there" and another officer picks up the knife. The two first responding officers who testified at trial did not see the knife. One officer stated he saw the skateboard but not the knife. The second officer who wore a body camera also could not recall seeing a knife. Additionally, a third officer who investigated the matter knew a knife had been recovered from the scene but never saw it. Accordingly, the video established the existence of the knife next to Kenneth's foot when the first responders arrived at the scene; a critical point for Mehlenbacher's self-defense claim. What is depicted in the video also corroborates the testimony of the two first responders who testified.

Significantly, during discussion of the in limine motions, defense counsel noted he was "okay with the video up until they move [Kenneth] from where he's laying [*sic*] and they start taking him down the stairs. It's not even the crime scene anymore." Based on the foregoing discussion, we conclude the initial and unobjected to portion of the video was highly relevant

27

but agree the portion of the video objected to by defense counsel showing officers taking Kenneth down the stairs and administering CPR was irrelevant. Nonetheless, we conclude admission of this portion of the video constituted harmless error.

The question is whether the video accurately depicts the nature of the crime without "unnecessarily play[ing] upon the emotions of the jurors." (*Ramirez, supra*, 39 Cal.4th at p. 454.) The trial court should have limited the video clip to the officers' discovery of Kenneth and ended it when the officers started to move him. However, the brief portion of the video showing the officers carrying Kenneth down the stairs and beginning CPR, considering the entire record, neither sensationalizes Kenneth's killing nor contains unnecessary gore. Accordingly, the court's error in admitting this portion of the video was harmless.

7.    *No error admitting video of Mehlenbacher holding a gun.*

a.    *Background*

During in limine discussions with the court, the prosecutor sought to admit a video of Mehlenbacher holding a gun and pointing it at a camera while Mehlenbacher recorded himself. When asked for a response, defense counsel asked that no audio be played with the video, or that a photograph be used instead. The court found the video, taken near the time of the shooting, admissible, noting another witness might identify the gun as the one used during the shooting. The court concluded either a video without sound or a photograph were admissible and left it to the prosecutor to decide which to use. At trial, the jury viewed, without objection, a silent video from Mehlenbacher's social media account showing Mehlenbacher filming himself inside a vehicle with a semiautomatic handgun. During closing, the

prosecutor argued the video evidenced Mehlenbacher's intent to kill with the gun.

        b.    *Analysis*

Mehlenbacher argues the video of him waving a gun while his lips are moving with no sound should have been excluded as cumulative to other evidence showing he had a gun before the shooting and because it was unduly prejudicial. We are not persuaded.[8]

Section 352 provides a trial court may "exclude even relevant evidence if its probative value is outweighed by other factors. Among them is the risk that admission will necessitate undue consumption of time. Cumulative evidence is excludable on this basis." (*People v. Burgener* (1986) 41 Cal.3d 505, 525.) Cumulative evidence can also be excluded when its low probative value is outweighed by the risk "of confusing the jury and obscuring the fundamental issues." (*People v. Carter* (1957) 48 Cal.2d 737, 749.)

Here, the video took very little time, less than 10 seconds. Mehlenbacher does not explain how this short video risked confusing the jury and obscuring fundamental issues. Moreover, "[e]vidence that is identical in subject matter to other evidence should not be excluded as 'cumulative' when it has greater evidentiary weight or probative value." (*People v. Mattson* (1990) 50 Cal.3d 826, 871.) Law enforcement testified they never located Mehlenbacher's gun. Bobby described the gun as a dark green pistol with a regular size magazine. This description fits the type of gun Mehlenbacher displayed in the video, corroborating Bobby's testimony. Photographic or video evidence is not cumulative simply because it illustrates facts otherwise

---

8    The People assert Mehlenbacher forfeited these arguments by failing to object to admission of the video. At trial, the court admitted the video subject to defense counsel's prior objections. On this record we decline to deem the issue forfeited.

presented through testimony. (*People v. Anderson* (2001) 25 Cal.4th 543, 592.) Finally, we reject Mehlenbacher's complaint the video was unduly prejudicial because it evoked an emotional bias against him. We fail to see how this short, silent video of him holding what is likely the murder weapon could have created an emotional bias against him where he admitted being the shooter.

> 8. *No error excluding evidence of Mehlenbacher previously being shot.*

> a. *Background*

The prosecutor moved to exclude evidence that in June 2020 Mehlenbacher was shot in the leg while attempting to steal or burglarize cars. He argued that without Mehlenbacher's testimony, no witnesses could establish how having been shot affected Mehlenbacher's state of mind at the time he shot Kenneth. At the pretrial hearing on the motion, defense counsel moved to admit this evidence, claiming it would explain why Mehlenbacher had a gun and further explain Mehlenbacher's inability to properly defend himself (his mobility was impaired), as relevant to imperfect self-defense. The court expressed skepticism regarding how defense counsel could show the ways in which being shot affected Mehlenbacher's state of mind when he shot Kenneth unless Mehlenbacher testified. The court acknowledged a defendant need not testify regarding his or her state of mind to establish self-defense, but the court expressed concern that the evidence was irrelevant because Mehlenbacher's proposed witnesses regarding his prior shooting injury (police officers and an individual who witnessed the shooting) would not be able to testify regarding what Mehlenbacher was thinking months later when he shot Kenneth. The court took the issue under submission to conduct research.

Relying on *People v. Gonzales* (1992) 8 Cal.App.4th 1658 (*Gonzales*) and "lots of [other] case law," the court later ruled that because Kenneth was not the person who had previously shot Mehlenbacher, and self-defense and imperfect self-defense require defendants actually believe they are in imminent danger, it would exclude the evidence of Mehlenbacher being shot unless he testified. Nonetheless, if evidence of Mehlenbacher's injured leg arose during trial, the court indicated it would allow defense counsel to ask how the injury occurred.

Bobby testified he always saw Mehlenbacher leave the apartment with a gun tucked in his front waistband. Mehlenbacher had been homeless before coming to live with him about a week and a half before the shooting. He also stated Mehlenbacher could not run because he had been shot in the leg a few months earlier.

b. *Analysis*

Mehlenbacher asserts the court prejudicially erred by excluding other evidence he was previously shot because the evidence was relevant to determine whether Kenneth's actions provoked him into acting under the heat of passion or in self-defense. At trial, defense counsel acknowledged Kenneth was not the person who previously shot Mehlenbacher. Additionally, nothing in the record suggests Mehlenbacher was shot by someone associated with Kenneth. On these facts, we agree with the trial court that evidence bearing on Mehlenbacher's perception of danger of Kenneth was insufficient to understanding Mehlenbacher's perspective and how a reasonable person would act under similar circumstances.

A homicide is considered justified as self-defense where the defendant actually and reasonably believed the use of deadly force was necessary to defend against imminent danger and defendant's belief was both objectively

31

and subjectively reasonable. (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082.) "If the belief subjectively exists but is objectively *unreasonable*," it is imperfect self-defense and the defendant may be convicted of manslaughter, but not murder. (*Ibid.*, italics added.) In such cases, the primary issue for the jury is the reasonableness of the defendant's subjective beliefs. (*Id.* at pp. 1082−1083.)[9]

Mehlenbacher contends evidence of being shot months prior to killing Kenneth was relevant because it created in Mehlenbacher a heightened sense of vigilance that caused him to act in self-defense, or imperfect self-defense, to the threat he believed Kenneth posed. To prove such a claim, Mehlenbacher needed to show he actually believed himself to be in deadly peril when he fired his gun, and in the case of perfect self-defense, that his belief was reasonable under the circumstances. First, Mehlenbacher presented no evidence to the court showing the June 2020 shooting affected him (e.g., that he became hypervigilant, depressed, withdrawn, or other evidence from which a trier of fact might conclude the experience of being shot in the leg changed his behavior.) Even assuming Mehlenbacher had presented such evidence, it was relevant only if it showed he actually feared for his life when he discharged his weapon. However, Mehlenbacher did not testify and presented no other evidence regarding his actual state of mind at the time he shot Kenneth. Accordingly, the trial court correctly determined the evidence addressing Mehlenbacher's state of mind was not relevant.

---

9    Similarly, the heat of passion theory has objective and subjective components. (*People v. Steele* (2002) 27 Cal.4th 1238, 1252.) The "defendant must actually, subjectively, kill under the heat of passion." (*Ibid.*) The objective component requires provocation sufficient to arouse the passions of the "ordinarily reasonable" person. (*Id.* at pp. 1252–1253.)

Mehlenbacher's reliance on *People v. Sotelo-Urena* (2016) 4 Cal.App.5th 732 is misplaced. In that case, the appellate court concluded the trial court erred by excluding expert testimony regarding the high rate of violence in the homeless community and the associated fear of violence many homeless individuals experience. (*Id.* at pp. 745–746, 750.) Although Sotelo-Urena did not testify on his own behalf, the defense introduced statements he made to the police immediately after the incident showing he was stabbed a few weeks earlier and believed the man that approached him was one of his previous attackers who was going to attack him again. (*Id.* at pp. 737–738.) This was direct evidence regarding the defendant's actual state of mind at the time the crime was committed, and the excluded evidence was relevant to the reasonableness of Sotelo-Urena's actions. (*Id.* at p. 750; see also *People v. Horn* (2020) 63 Cal.App.5th 672, 677, 685–686 [defendant testified how his physical limitations affected his mind at the time he shot the victim].) Here, no evidence existed regarding Mehlenbacher's actual state of mind or showing he feared for his life when he shot Kenneth.[10] We conclude the trial court did not err when it excluded evidence Mehlenbacher was previously shot in the leg.

B.    *Alleged Instructional Error*

We now turn to Mehlenbacher's arguments regarding jury instructions. He contends the court committed instructional error when it (1) denied two requested pinpoint instructions and (2) refused to instruct regarding involuntary manslaughter. We separately address each contention.

[10]    Mehlenbacher's reliance on *People v. Lee Chuck* (1887) 74 Cal. 30 is also misplaced. This case stands for the proposition evidence of threats from the victim's associates may be used to support a self-defense claim and show the defendant believed his life was in danger. (*Id.* at p. 34; see also *People v. Minifie* (1996) 13 Cal.4th 1055, 1067 (*Minifie*).) There is no such evidence in the instant case.

1. *The court did not err by denying Mehlenbacher's requested pinpoint instructions.*

    a.    *Background*

Defense counsel requested two pinpoint instructions. The first proposed pinpoint instruction read: "The jury may consider the effect of 'antecedent threats and assaults against the defendant on the reasonableness of defendant's conduct.' (*People v. Garvin* (2003) 110 Cal.App.4th 484, 488 [citation omitted].)" The court refused to give this instruction for the same reason it excluded evidence Mehlenbacher was previously shot. The court explained Kenneth did not shoot Mehlenbacher and, in the absence of testimony from Mehlenbacher, there was no evidence what effect being shot had on Mehlenbacher's thought process when he shot Kenneth.

The second proposed pinpoint instruction read: "A defendant's physical limitations are relevant when deciding the reasonable person standard for self-defense. (*People v. Horn*[*, supra*, 63 Cal.App.5th at p. 686].)" The court refused to give this instruction to the jury because, while Mehlenbacher was unable to run down the apartment stairs, he had no difficulty walking down the stairs or driving his car after the shooting; thus, insufficient evidence showed his leg injury influenced how he acted when he shot Kenneth.

    b.    *Analysis*

Mehlenbacher maintains the court erred when it failed to give the pinpoint instructions because they were correct statements of law and not argumentative or duplicative of other instructions. The People disagree, arguing substantial evidence did not support giving the instructions.

"Pinpoint instructions" relate specific facts to a legal issue in the case to highlight or "pinpoint" the crux of a defendant's case. (*People v. Ward* (2005) 36 Cal.4th 186, 214.) Upon request, a pinpoint instruction must be given when supported by substantial evidence unless it is argumentative or

34

duplicates other instructions. (*People v. Bolden* (2002) 29 Cal.4th 515, 558–559.) "We review claims of instructional error de novo." (*People v. Zemek* (2023) 93 Cal.App.5th 313, 346.)

Defendants asserting a claim of self-defense, and seeking to provide evidence of threats by the victim or those associated with the victim to support the reasonableness of their perceptions and resulting beliefs, are "entitled to an instruction on the effect of antecedent threats or assaults *by the victim* on the reasonableness of defendant's conduct." (*Gonzales, supra*, 8 Cal.App.4th at pp. 1663–1664, original italics.) The right to such an instruction is based on common sense and experience that a defendant previously threatened or assaulted by another person may reasonably " 'be on heightened alert' " upon encountering that person again. Moreover, the instruction contemplates that the defendant will reasonably take prior threats or assaults " 'into account in deciding the necessity for, and the amount of, defensive action, in response to any act on the part of [that person] reasonably appearing to be calculated to carry out that threat [or assault].' " (*Minifie, supra*, 13 Cal.4th at p. 1065.)

Here, substantial evidence did not support Mehlenbacher's first pinpoint instruction regarding the effect of antecedent threats or assaults on the reasonableness of his conduct because he did not proffer evidence showing Kenneth or someone associated with Kenneth previously threatened or assaulted him. A person who has been previously threatened or assaulted is not justified in taking quicker and harsher measures for his or her own protection as to "*all the world*" than would a person who had not been so threatened or assaulted. (*Gonzales, supra*, 8 Cal.App.4th at p. 1664, original italics.)

Similarly, substantial evidence did not support the second proposed pinpoint instruction regarding his physical limitations. Evidence existed showing Mehlenbacher could walk down a flight of stairs but could not run because he was shot in the leg a few months earlier. But no evidence existed showing this injury impacted his decision to shoot Kenneth. Rather, he opened a door separating Kenneth from himself and shot Kenneth, who was about 15 feet away. These circumstances do not support the requested pinpoint instruction.

> ### 2. *The court did not err by refusing to instruct on involuntary manslaughter.*

> #### a. *Background*

Defense counsel requested the court instruct the jury with the pattern instruction for involuntary manslaughter (CALCRIM No. 580). He argued the facts supported the instruction because Mehlenbacher fired a single gunshot, in a dark hallway from at least 20 feet away, no bullet was recovered, and no investigation was conducted to determine whether a projectile ricocheted and hit Kenneth. The court questioned how involuntary manslaughter applied when firing a gun in such close quarters from that distance constituted, at the very least, a conscious disregard for human life. It refused to give the involuntary manslaughter instruction because the facts did not support it. Instead, it instructed the jury on first degree murder based on premeditation and deliberation (CALCRIM No. 521), first or second degree murder with malice (CALCRIM No. 520), and voluntary manslaughter based on sudden quarrel or heat of passion (CALCRIM No. 570), self-defense (CALCRIM No. 505), and imperfect self-defense (CALCRIM No. 571).

> #### b. *Analysis*

Mehlenbacher contends the court erred by failing to instruct on the lesser offense of involuntary manslaughter because there is no way to

conclude with absolute certainty he understood or appreciated the risk to human life at the time he pulled the trigger. He also claims substantial evidence supported the instruction because no evidence existed disproving the possibility the bullet he fired ricocheted and hit Kenneth in the head.[11] We are not persuaded.

Involuntary manslaughter is an unlawful killing of a human being without malice or with mitigated malice. (Pen. Code, § 192, subd. (b).) "Involuntary manslaughter is a lesser offense of murder, distinguished by its mens rea." (*People v. Butler* (2010) 187 Cal.App.4th 998, 1006.) "The mens rea for murder is specific intent to kill [actual malice] or conscious disregard for life [implied malice]. [Citation.] Absent these states of mind, the defendant may incur homicide culpability for involuntary manslaughter . . . ." (*Ibid.*) The mens rea for involuntary manslaughter is criminal negligence. (*Ibid.*)

" '[T]he existence of "*any* evidence, no matter how weak" will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is "substantial enough to merit consideration" by the jury. [Citations.] "Substantial evidence" in this context is " 'evidence from which a jury composed of reasonable [persons] could . . . conclude[ ]' " that the lesser offense, but not the greater, was committed.' " (*People v. Moye* (2009) 47 Cal.4th 537, 553, original italics.)

The record does not contain substantial evidence showing Mehlenbacher killed without malice under circumstances demonstrating criminal negligence. Instead, the record shows he purposely opened the door,

---

11     This would make the shot he fired at Kenneth a warning shot, or an effort to scare Kenneth to stop Kenneth's loud activity.

stated "I'm going to shoot you," then pulled the slide back on the gun, raised it to shoulder level, and fired it. When Bobby asked if he shot Kenneth, Mehlenbacher responded, "Yeah." Mehlenbacher points to nothing in the record indicating he lacked a subjective awareness of the danger his conduct posed to human life. Even viewing the evidence in the light most favorable to him, a rational jury could not have entertained a reasonable doubt as to whether Kenneth's death was accomplished by implied malice during an inherently dangerous assaultive felony. Thus, the court did not err when it refused to instruct on involuntary manslaughter.

C.     *Alleged Prosecutorial Error*

1.     *General Legal Principles*

"A prosecutor engages in misconduct by misstating facts or referring to facts not in evidence, but he or she enjoys wide latitude in commenting on the evidence, including urging the jury to make reasonable inferences and deductions therefrom." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 95.) "Advocates are given significant leeway in discussing the legal and factual merits of a case during argument. [Citation.] However, 'it is improper for the prosecutor to misstate the law . . . .' " (*Centeno, supra*, 60 Cal.4th at p. 666.) "A prosecutor's conduct violates the Fourteenth Amendment of the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial [error] under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." (*People v. Morales* (2001) 25 Cal.4th 34, 44.)

To establish prosecutorial error during comments made to the jury, appellant must show that " '[i]n the context of the whole argument and the

38

instructions' [citation], there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' " (*Centeno, supra*, 60 Cal.4th at p. 667.) It is the defendant's burden to show the jury construed the prosecutor's remarks in an objectionable fashion. (*People v. Ramirez* (2022) 13 Cal.5th 997, 1129.)

To preserve a claim of prosecutorial misconduct or error, a defendant must timely object and request a curative admonition unless an admonition would not have cured the harm caused by the misconduct or error. (*People v. Hinton* (2006) 37 Cal.4th 839, 863.) The failure to raise the issue of prosecutorial error at trial generally forfeits the right to appellate review of that issue. (*People v. Thomas* (2011) 51 Cal.4th 449, 491–492.) Although Mehlenbacher's counsel failed to raise the issue of prosecutorial misconduct at trial, we may nonetheless reach the merits of his claim given his alternative argument that his counsel rendered ineffective assistance of counsel.

Here, defense counsel did not object at trial to any of the alleged prosecutorial errors alleged on appeal. We address each alleged instance of alleged prosecutorial error separately to evaluate whether it is reasonable to believe the jury understood the prosecutor's comments to convey an improper meaning. If so, we consider whether anything in the record indicates an objection would have been futile or whether the prosecutor's argument was "so extreme or pervasive that a prompt objection and admonition would not have cured the harm." (*Centeno, supra*, 60 Cal.4th at p. 674.) Finally, we analyze his alternative argument that defense counsel's failure to object constituted ineffective assistance of counsel.

2.    *References to Kenneth's age and last moments did not constitute error.*

Mehlenbacher claims the prosecutor improperly appealed to the jurors' sympathy and passion during opening statement and closing argument when the prosecutor (i) played a "snippet" from an officer's body-worn camera video during opening statement and said, "These are the last moments of [Kenneth's] life"; (ii) referred to that video during closing argument and recounted "those guttural breaths, the last moments in [Kenneth's] life, where his body was struggling to survive as officers were rendering aid"; (iii) played the video during closing argument saying, "Those are [Kenneth's] last moments"; and (iv) commented on Kenneth while playing a witness's 911 call.

Mehlenbacher does not argue, nor does anything in the record indicate, that an objection would have been futile or that the prosecutor's statements were "so extreme or pervasive that a prompt objection and admonition would not have cured the harm." (*Centeno, supra*, 60 Cal.4th at p. 674.) Thus, the only question is whether the record establishes ineffective assistance of counsel as a matter of law.

" 'It has long been settled that appeals to the sympathy or passions of the jury are inappropriate at the guilt phase of a criminal trial.' " (*People v. Vance* (2010) 188 Cal.App.4th 1182, 1192.) To the extent referring to Kenneth as a "kid" and recounting the last moments of his life as depicted by officer's body-worn camera video appealed to the jury's sympathy and passion, we conclude Mehlenbacher was not prejudiced by counsel's failure to object to these references because the court instructed the jury pursuant to CALCRIM No. 200. This instruction informed the jury that it should not let "bias, sympathy, prejudice, or public opinion influence [its] assessment of the evidence or [its] decision," including any bias in favor of or against any

defendant, or alleged victim, because of age. We presume, in the absence of evidence to the contrary, the jury understands and follows instructions from the trial court. (*People v. Fauber* (1992) 2 Cal.4th 792, 823.)

Moreover, defense counsel could have reasonably determined objections to these descriptive words were not warranted because they constituted fair comment on the evidence. Kenneth's last moments of life as depicted by an officer's body-worn camera video, including audio, was already in evidence. The prosecutor's comments " 'did not mischaracterize or assume facts not in evidence, but merely commented on the evidence and made permissible inferences.' " (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 787 (*Holmes*).) Because no prosecutorial misconduct existed, defense counsel had no cause to object, and Mehlenbacher's claim of ineffective assistance fails.

3. *Any misstatements of law were not prejudicial.*

Mehlenbacher contends the prosecutor misstated the law (1) of heat of passion during closing and rebuttal argument by implying that provocation must be of the kind that would cause an ordinary person of average disposition to kill, (2) of imperfect self-defense during closing argument, and (3) during jury selection and closing argument by misleading the jury into believing Mehlenbacher's age could not be considered. We separately address each contention.

a. *Heat of Passion*

The People concede the prosecutor misstated during closing and rebuttal argument that the standard for heat of passion is whether an adequate provocation would move an ordinary person of average disposition

41

to kill.[12]  We agree.  Heat of passion which reduces murder to voluntary manslaughter requires a person of average disposition to react to the provocation with his or her reason and judgment obscured.  (*People v. Beltran* (2013) 56 Cal.4th 935, 949 (*Beltran*).)  "[P]rovocation is not evaluated by whether the average person would act in a certain way:  to kill.  Instead, the question is whether the average person would *react* in a certain way:  with his reason and judgment obscured."  (*Ibid.*)

Nevertheless, during closing argument, the prosecutor explained the correct legal standard to the jury before the remarks Mehlenbacher complains about.  When the prosecutor started to talk about heat of passion, he correctly told the jury the "provocation . . . must be one that would cause an emotion so intense to an ordinary person that somebody would simply act without reflection or a thought process. . . .  And the analysis here is that

---

[12]    During closing argument, the prosecutor stated:  "The test is would a reasonable person in the same situation acted—would act in the same way the defendant did?  Would a reasonable person who just heard a loud bang outside, would he grab a gun, open the door, rack it, and pull the trigger?  Absolutely not, ladies and gentlemen.  That is ridiculous.  That is a ludicrous argument to think that a reasonable person would ever do anything like that, but that's exactly what the defendant did because he had the intent to kill.  [¶]  So sufficient provocation is required, sufficient provocation for what occurred.  And what occurred?  It was a shooting. . . .  [¶]   . . . [A]nd that bang is so provocative that the defendant is so overcome by his emotions . . . that it was reasonable that an average person would go out and pull a gun on the individual and pull the trigger.  This is not heat of passion.  It's not even close, ladies and gentlemen.  That is a ludicrous argument to even consider."

During rebuttal argument, the prosecutor stated:  "And then you have to find whether or not there's sufficient provocation for a reasonable individual to do what the defendant did.  Nobody is going to do that after hearing a loud bang outside.  Who's going to open the door, load the gun, and fire a bullet into somebody's head?  That's not reasonable.  That's a ludicrous argument, ladies and gentlemen.  This is not heat of passion."

provocation would cause a person of average disposition to act rashly and without . . . due deliberation that is from passion rather than judgment."

Moreover, the court fully and properly instructed the jury on the law regarding the prosecutor's burden of proof and heat of passion. It instructed the jury, "If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions." Additionally, the evidence established Mehlenbacher did not shoot Kenneth in self-defense or under the heat of passion, but instead he acted with at least implied malice when he opened the door, pulled back the gun's slide, aimed the weapon, and fired a bullet into Kenneth's head. There is no reasonable likelihood of a different result had defense counsel objected to these statements of the prosecutor. Mehlenbacher fails here to prove ineffective assistance of counsel.

Mehlenbacher also complains the prosecutor gave misleading examples during closing argument where heat of passion was appropriate and reminded the jury to "not ignore the examples" during rebuttal. Specifically, the prosecutor gave the following examples:

> A father kills his child['s] molester. He walks in on, you know, his brother, the child's uncle, molesting his child. He's so overcome by emotions that he's no longer able to process information correctly and he pulls the trigger or he grabs a knife and starts hacking away before he even realizes what he did. That's heat of passion, ladies and gentlemen. Same thing, brother walks in on his sister being raped and then he goes and kills the rapist. Seeing the most horrific thing someone could imagine seeing happening to your blood. This isn't somebody making a loud bang outside because you're trying to go to sleep. That's not provocation. That's not even close.

> Or a woman who's in a vehicle gets T-boned by a drunk driver, sees that her husband in the driver's seat is dead, they carry a weapon, she pulls it out and shoots the driver. These are heat of passion situations. These are the

43

> examples that this law was created to encapsulate because the law recognizes legitimate human frailty, that these things can happen and you can be overcome by the emotions so that you cannot process correctly. That is not what happened here, ladies and gentlemen. Do not call this anything less than what it is: murder.

Without citation to authority, Mehlenbacher contends these examples misled the jury. For heat of passion to exist "the provocation must be one that would cause an emotion so intense that an ordinary person would simply react, without reflection." (*Beltran, supra*, 56 Cal.4th at p. 949.) "[T]he anger or other passion must be so strong that the defendant's reaction bypassed his thought process to such an extent that judgment could not and did not intervene." (*Ibid.*) Here, the prosecutor merely provided examples of states of mind in which he suggested reaction bypassed any thought process. The examples do not misstate the law regarding provocation and heat of passion.

Assuming the hypotheticals could be erroneously construed to suggest that the only circumstances making a homicide lawful or constituting adequate provocation are defense of others or seeing a loved one killed, Mehlenbacher has not shown a reasonable likelihood the jury misapplied the law because of the prosecutor's examples. The prosecutor correctly argued heat of passion requires an intense emotion that causes a person to act without reasoning, thought, or reflection. Here, the court correctly instructed the jury that "[a]s a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment" and "[h]eat of passion does not require anger, rage, or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation and reflection." When argument runs counter to instructions given a jury, we will ordinarily conclude the jury followed the latter and disregarded the former, for "[w]e presume that jurors treat the

44

court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade." (*People v. Clair* (1992) 2 Cal.4th 629, 663, fn. 8.)

Mehlenbacher has not shown his defense counsel acted unreasonably by not objecting to the prosecutor's examples. Defense counsel could have reasonably decided not to risk an overruled objection when his closing argument and the jury instructions correctly stated the law. Even if counsel objected and the court sustained the objection, the result would have been a correction and admonition from the court and an amended argument from the prosecutor. On this undeveloped record on direct appeal, it is impossible to establish the absence of an objection arose from deficient performance.

b. *Imperfect Self-Defense*

We reach the same conclusion for Mehlenbacher's claim of prosecutorial error regarding the prosecution's imperfect self-defense argument. "Under the doctrine of imperfect self-defense, when the trier of fact finds that a defendant killed another person because the defendant actually but unreasonably believed he was in imminent danger of death or great bodily injury, the defendant is deemed to have acted without malice and thus can be convicted of no crime greater than voluntary manslaughter." (*In re Christian S.* (1994) 7 Cal.4th 768, 771.) During closing argument, the People concede the prosecutor misstated the law of imperfect self-defense when he argued, on two occasions, Mehlenbacher must have "reasonably believed he was in imminent danger [of] death [or] great bodily injury," instead of arguing the correct standard that he had to "actually but unreasonably" believe he was in imminent danger of death or great bodily injury. (*Ibid.*)

Defense counsel could have logically chosen not to object because he addressed imperfect self-defense during his closing argument and the court

correctly instructed the jury on the issue. On this record, Mehlenbacher has not met his burden of showing that in the context of the whole argument and instructions, a reasonable likelihood existed the jury understood or applied the complained-of comments in an improper or erroneous manner. (*Centeno, supra*, 60 Cal.4th at p. 667.)

> c.  *Consideration of Mehlenbacher's Age*

Mehlenbacher also complains that both during jury selection and later in closing argument, the prosecutor misled the jury into believing his age could not be considered. He contends the prosecutor misstated the law by telling the jury his age could not be considered and was irrelevant to any issue it needed to decide. Mehlenbacher concedes the cases he cites in support of this proposition all involved individuals who were not yet 18 years old when they committed the crimes but contends "none of the characteristics of youth discussed in the cases end abruptly on one's 18th birthday." Viewing the prosecutor's statements in context, no prosecutorial error appears.

During voir dire, the prosecutor asked whether the victim deserved what was coming to him and whether this was a reason to find a defendant not guilty. He then posed the questions whether a defendant should be found not guilty based on what neighborhood the defendant came from, the color of their skin, or their age. The prosecutor told the prospective jurors: "Jury instructions don't apply to age. Jury instructions don't apply to whether or not somebody is good-looking or not good-looking, or a man or a woman, or black or white. They apply to defendants, the witnesses all in the same way."

The prosecutor never told the jury it could not consider age as one of the circumstances informing its analysis of self-defense, imperfect self-defense, and heat of passion voluntary manslaughter, as Mehlenbacher implies. Rather, during voir dire, the prosecutor asked questions about

Mehlenbacher's age to determine whether any of the prospective jurors would have difficulty setting aside their emotions based on Mehlenbacher's age. The prosecutor followed up with additional questions to determine whether the prospective jurors could set aside any sympathy they had based on Mehlenbacher's age or whether a bias existed. The prosecutor reiterated this point during closing argument:

> It is not an 18-year-old kid that you keep hearing, a child, immature, building sympathy in your minds so that you feel some sort of hesitation to convict an individual because of their age. And we talked about this during jury selection. That is not the way the law applies. 18 years old, 88 years old, you apply these facts to the law regardless of age, regardless of the defendant's maturity level. This was murder. Nothing less.

Penal Code section 1127h requires a trial court to instruct jurors not to let sympathy or bias influence their decision. Accordingly, the court instructed based on CALCRIM No. 200 that jurors should not let "bias [or] sympathy . . . influence [their] assessment of the evidence or [their] decision," including any bias in favor of or against any defendant, or alleged victim, because of age. These instructions, and the prosecution's related argument, were intended to prevent sympathy from influencing the jury's decision based on Mehlenbacher's young age, rather than minimizing the prosecution's burden of proving his mental state. Mehlenbacher has not met his burden of showing that in the context of the whole argument and instructions, a reasonable likelihood existed the jury understood or applied the complained-of comments in an improper or erroneous manner. (*Centeno, supra*, 60 Cal.4th at p. 667.)[13]

_____

[13] We also note that at the time of Mehlenbacher's trial in June and July 2022, the case law on this subject had not yet been extended to young

4. *Any misstatements of evidence were not prejudicial.*

At trial, two border patrol agents testified they received no alerts concerning the car they chased and did not know who was in the car. The second agent stated he discontinued pursuing the car because he did not want to risk a fatality. During closing argument, the prosecutor paraphrased the second agent's testimony, stating:

> But, eventually, the defendant was acting so recklessly and so dangerously in an effort not to be caught, in an effort not to be convicted of murder, that finally the Border Patrol agent said "Enough is enough. If I keep doing this, *this person is just going to kill somebody else*," and he withdr[e]w from the pursuit and the defendant was able to get away. (Italics added.)

Mehlenbacher contends the prosecutor misstated the evidence because the border patrol agents did not know Mehlenbacher had shot someone. It is prosecutorial error to argue facts not in evidence. (*Holmes, supra*, 12 Cal.5th at p. 787.) Here, it is likely defense counsel did not object because the context of the prosecutor's statements make it clear his statements focused on Mehlenbacher's dangerous driving during his flight after the shooting, not the border patrol agent's knowledge. To the extent a juror may have focused on the phrase "somebody else" and construed the statement to mean the

---

adults who were 18 years of age or older at the time of their crimes. (See *People v. Jimenez* (2024) 103 Cal.App.5th 994, 1001–1004 [tracing the chronological expansion of case law "beyond its Eighth Amendment roots to young adults who were in their teens and early 20s at the time of their crimes"].) Given more recent legal authority, prosecutors should generally avoid suggesting to a jury that youth and immaturity are irrelevant in assessing a murder defendant's culpability or mental state. Even under current law, however, the prosecutor committed no error simply by informing the jurors they should apply the jury instructions regardless of Mehlenbacher's age and should not allow sympathy to influence their verdict based on his age.

agents knew Mehlenbacher had killed someone earlier, both agents testified they had no knowledge of who was in the car during the pursuit. Additionally, the court instructed the jury, based on CALCRIM No. 200, "You must decide what the facts are in this case. It is up to all of you, and you alone, to decide what happened, based only on the evidence that has been presented to you in this trial." To the extent the prosecutor's statement constituted prosecutorial error, Mehlenbacher has not met his burden of showing a reasonable likelihood existed the jury understood or applied the complained-of comments in an improper or erroneous manner. (*Centeno, supra*, 60 Cal.4th at p. 667.)

5. *The prosecutor did not take unfair advantage of excluded defense evidence.*

The trial court granted the prosecutor's motion to exclude evidence that in June 2020 Mehlenbacher was shot in the leg while attempting to steal or burglarize cars. Nonetheless, if evidence of this injury arose during trial, the court stated it would allow defense counsel to ask how the injury occurred. At trial, Bobby testified Mehlenbacher could not run after being shot in the leg a few months earlier. Mehlenbacher contends the prosecutor took unfair advantage of the trial court's ruling to exclude additional evidence relating to Mehlenbacher being shot. Mehlenbacher specifically points to the prosecutor's argument to the jury that Mehlenbacher intended to kill someone by arming himself with a gun and posting a video of himself pointing the gun at the camera two days before the shooting.

"Prosecutors should never assert or imply that there is no evidence on a certain point when they know such evidence exists but was excluded by the court." (*People v. Castaneda-Prado* (2023) 94 Cal.App.5th 1260, 1294.) Here, the prosecutor did not attempt to prove his case by attesting to facts unknown to the jury. Instead, he asked the jury to draw inferences from the

49

evidence received during the trial.  The prosecutor's challenged statement that Mehlenbacher armed himself intending to shoot someone was a reasonable inference from the evidence.  A prosecutor has wide latitude to comment on the state of the evidence and draw reasonable inferences or deductions.  (*People v. Martinez* (2010) 47 Cal.4th 911, 957.)  " 'Whether the inferences the prosecutor draws are reasonable is for the jury to decide.' " (*People v. Wilson* (2005) 36 Cal.4th 309, 337.)  The prosecutor's statement does not constitute prosecutorial error and defense counsel reasonably decided not to object.  In any event, the court instructed the jury that statements by attorneys are not evidence.  (CALCRIM No. 222.)  Thus, even if we assumed impropriety in the prosecutor's argument, "it was cured when the trial court instructed the jury with the standard admonition that argument is not evidence."  (*People v. Cash* (2002) 28 Cal.4th 703, 734.)

D.    *Alleged Improper Response to Jury Question*

       1.    *Background*

       Early in deliberations, the jury sent the trial court Jury Note No. 1 stating, "We would like clarification on definitions of 'deliberately' and 'premeditation' as well as 'heat of passion'.  [¶]  Also, please clarify paragraphs 1 & 2 of 521."  Without seeking any input from counsel or bringing the jury into the courtroom to discuss the note, the court responded as follows:  "The words 'deliberately' and 'premeditation' are specifically defined in Instruction No. 521.  The Court cannot clarify those words beyond the definitions provided in that instruction.  [¶]  The concept of "Heat of Passion" is thoroughly explained in Instruction No. 570.  The Court cannot further explain or clarify what is provided in that instruction.  [¶]  Finally, the Court cannot clarify paragraphs 1 & 2 of Instruction No. 521.  The

50

meaning of the words used in these paragraphs is for you to decide."[14] About a half-hour later,[15] at 1:09 p.m., the judge emailed counsel to inform them about the note, the court's response, and said they would receive copies of both when they came back to the courtroom.

The court went on the record at 1:31 p.m. to address Jury Note No. 2 regarding their inability to agree about whether Mehlenbacher was guilty of first degree murder. The court responded to the second jury note, with neither counsel objecting to the court's response to the first jury note. After the court responded to the second jury note, the court asked the jury whether it could do anything else to assist it, suggesting: "Further readings of testimony? More instructions?" The court received no response.

2.  *Analysis*

Mehlenbacher asserts the court erred in responding to the jury's first question outside his presence and without notifying and obtaining counsel's input. He claims prejudice because "the jury expressed its confusion over the

---

[14]   Paragraphs 1 and 2 of CALCRIM No. 521, as given, provide: "The defendant is guilty of first degree Murder if the People have proved that he acted willfully, deliberately, and with premeditation. The defendant acted *willfully* if he intended to kill. The defendant acted *deliberately* if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. The defendant acted with *premeditation* if he decided to kill before completing the act that caused death. [¶] The length of time the person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time." (Original italics.)

[15]   The court responded to Jury Note No. 1 at 12:42 p.m.

51

mental states required for the legal theories and the first degree murder instruction." The People concede the error but argue it was harmless beyond a reasonable doubt.

A trial court is statutorily required to give notice to the defendant and defense counsel of any proceedings during the deliberative process. (Pen. Code, § 1138;[16] *People v. Garcia* (2005) 36 Cal.4th 777, 801–802.) This gives counsel the opportunity to suggest an alternative course for the trial court to take or object to the court's course of action. (*Garcia*, at p. 802.) A criminal defendant, however, forfeits a claim of error based on an ex parte communication between the judge and jury by failing to object or move for mistrial. (*People v. Jennings* (1991) 53 Cal.3d 334, 383 (*Jennings*); *In re S.B.* (2004) 32 Cal.4th 1287, 1293, fn. 2 ["the loss of a right based on failure to timely assert it is 'forfeiture' "].) "Moreover, it is questionable 'whether a defendant should be permitted to sit back, await a jury verdict, and then assert error based on the court's improper communication with the jury' [citation], at least when the improper communication was relatively minor." (*Jennings*, at p. 384.)

While Mehlenbacher is correct the court's action denied him the opportunity to make a contemporaneous objection to the ex parte communication, the court notified counsel of the communication and went on the record less than 30 minutes later to address a second jury note. We conclude defense counsel had the opportunity to object to the court's action on

---

16     Penal Code section 1138 provides: "After the jury have retired for deliberation, if there be any disagreement between them as to the testimony, or if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court. Upon being brought into court, the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called."

Jury Note No. 1, move for a mistrial, or request the court give the jury additional guidance to address any potential jury confusion. Defense counsel's silence could be construed as tacit approval of the court's response. "Approval of the court's action, even though it might have been a technical violation of section 1138 of the Penal Code, cures any possible error." (*People v. Kageler* (1973) 32 Cal.App.3d 738, 746.)

In any event, we address Mehlenbacher's alternative ineffective assistance of counsel claim, finding the error harmless. (*Chapman, supra*, 386 U.S. at p. 24; *Jennings, supra*, 53 Cal.3d at 383–384 [unauthorized ex parte communications between the judge and jury are subject to the *Chapman* harmless error standard of review].) Here, the ex parte communication was not prejudicial because the court's response was neutral, did not favor either side, and properly stated the law. The jury did not request "additional" instruction, but for "definitions" and "clarif[cation]." Where "the original instructions are themselves full and complete, the court has discretion under [Penal Code] section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information. [Citation.] Indeed, comments diverging from the standard are often risky." (*People v. Beardslee* (1991) 53 Cal.3d 68, 97.) Because the instructions already provided to the jury contained the requested definitions, the court was well within its discretion to simply refer the jury back to CALCRIM No. 521.

Moreover, in arguing prejudice, Mehlenbacher fails to explain how another response might have led to a different result in his favor. (*Jennings, supra*, 53 Cal.3d at pp. 384–385 [judge's ex parte response to a juror's question not prejudicial because "nothing in the court's admonition to the jury was an incorrect statement of law"].) Any objection defense counsel

53

might have made would have been properly overruled. Because the trial court's response was not erroneous, it "did not implicate [Mehlenbacher's] substantial rights." (*Id.* at p. 385.) While the trial court erroneously provided the response without notice to the parties, such error was harmless under any standard of prejudice.

E.    *Alleged Cumulative Error*

Even if none of the errors individually requires reversal, Mehlenbacher contends their cumulative impact compels the judgment be reversed, because it caused him substantial prejudice and rendered his trial fundamentally unfair. "Under the 'cumulative error' doctrine, errors that are individually harmless may nevertheless have a cumulative effect that is prejudicial." (*In re Avena* (1996) 12 Cal.4th 694, 772, fn. 32.) A claim of cumulative error is essentially a due process claim. (*People v. Rivas* (2013) 214 Cal.App.4th 1410, 1436.) The test is whether the defendant received a fair trial. (*Ibid.*)

In our discussion, we found four errors. We found any error in admitting the photograph of Kenneth alive and the body-worn camera video showing Kenneth being carried down the stairs with the officer administering CPR was harmless. (*Ante*, pt. III.A.6.b.i & iii.) We also concluded any misstatements of law or evidence by the prosecutor were not prejudicial. (*Ante*, pt. III.C.3 & 4.) Finally, we found the court erred in responding to the jury's first question outside Mehlenbacher's presence and without notifying and obtaining counsel's input, but we concluded the error harmless beyond a reasonable doubt. (*Ante*, pt. III.D.2.)

Having found these errors individually harmless, we reach the same conclusion when considering the errors together: " 'their cumulative effect does not warrant reversal of the judgment.' " (*People v. Henriquez* (2017)

54

4 Cal.5th 1, 48.)  We conclude that Mehlenbacher received a fair trial that comported with due process.

## IV.
## DISPOSITION

The judgment is affirmed.


                                                        RUBIN, J.

WE CONCUR:


BUCHANAN, Acting P. J.


KELETY, J.